UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>    v.    )<br>)    Docket No. 1:19-cr-10159-MLW<br>JOVANI MIRANDA    )<br>    Defendant.    ) | |

<u>DEFENDANT'S SENTENCING MEMORANDUM</u>

Defendant Jovani Miranda respectfully submits this Sentencing Memorandum.

**I.     Proceedings to Date**

On January 15, 2019, Mr. Miranda was arrested by the Boston Police and charged with firearm related offenses in Dorchester District Court.  *See* Presentence Report ("PSR") ¶ 46. The United States Attorney's Office for the District of Massachusetts adopted this state criminal case.  Mr. Miranda was arrested by federal law enforcement agents and he made his initial appearance in this Court on May 16, 2019.  PSR ¶ 1.  He has been detained in federal custody since that date at the Donald Wyatt Detention Facility ("Wyatt").

On January 28, 2020, Mr. Miranda pled guilty to a single-count Superseding Indictment charging him with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).[1] The defense asks for a sentence of "time served," which reflects the time Mr. Miranda has spent in custody since his arrest. As of the date of sentencing in this case, Mr. Miranda will have served 12 months, 25 days.  In terms of a period of supervised release, the

---

1 The superseding indictment was not brought by the United States Attorney's Office to add criminal charges or to change the original charge under 18 U.S.C. § 922(g)(1).  The language of the indictment was amended to conform with the United States Supreme Court's decision in *Rehaif v. United States*, 139 S. Ct. 2192 (2019).  Prior to his change of plea, defense counsel reviewed the *Rehaif* decision and relevant issues with Mr. Miranda.  Understanding these points, Mr. Miranda voluntarily and intelligently entered a plea of guilty to the superseding indictment.

defense requests 3 years with a special condition that the first 6 months be served in home confinement with electronic monitoring at his family's residence in Taunton, Massachusetts. The requested sentence is supported by the required statutory factors set out in 18 U.S.C. 3553(a) but is also based on considerations relating to the ongoing COVID-19 pandemic. The recommended sentence is sufficient, but not greater than necessary, to address the sentencing goals.

**II.     Offense Conduct and Applicable Guidelines Range**

Mr. Miranda, a previously convicted felon, was found in possession of a loaded firearm after a traffic stop by Boston Police officers on January 15, 2019.  He was the front passenger in a car containing three other companions that reportedly made an illegal U-turn.  This observation was made by several plain clothes police officers in an unmarked car who were following Mr. Miranda and his friends.  After the car had pulled over to the side of the road, these officers approached and observed a bottle of liquor and a plastic cup in the area where Mr. Miranda was seated.  *See* Exhibit A.  He was asked to step from the car by the officers and when it appeared that they were going to pat him down, he volunteered that he had a gun in his possession.  The officers removed the gun from his jacket pocket and he was charged in Dorchester District Court with the criminal case that would eventually become this federal prosecution.

The applicable guideline, in agreement with the United States Probation Office, was base level 20 because Mr. Miranda committed the instant offense after sustaining a felony conviction for distribution of a Class D substance (marijuana) (USSG § 2K2.1(a)(4)(A)); the base offense level is increased to 24 because the handgun recovered had an obliterated  serial number (§ 2K2.1(b)(4)(B)); the adjusted offense level is decreased by 3 for acceptance of responsibility (§ 3E1.1), so there is a resultant Total Offense Level of 21. With a criminal history score of six in Criminal History Category ("CHC") III, the range is 46-57 months.

**III**.    **Mr. Miranda's Health, Environment, and Relationships Led to his Conviction**

   **A. Coping with the effects of epilepsy**

Mr. Miranda is 28 years old and was born in Boston, Massachusetts into a close knit Cape Verdean family. He was raised by both his parents and lived, all of his life, with extended family under one roof at an address on Norton Street in Dorchester. *See* PSR ¶ 57. The family rented in an apartment building in which he lived with his parents, his two sisters, his sister's child, his brother, and his grandmother. After many years, the family recently relocated to an address in Taunton, Massachusetts. *Id.* Mr. Miranda's mother, Maria, has been particularly concerned about his involvement with this criminal matter, has kept informed about its progress, and she and the family are forever supportive of him. *See* Exhibit B, Letter of Cipriano and Maria Miranda.

In terms of his health, Mr. Miranda was diagnosed with epilepsy in 2017 and has experienced severe seizures on multiple occasions since then. *See* PSR ¶ 59. He has been prescribed the anticonvulsant medication Keppra (1500 mg) on a daily basis at Wyatt and has been referred to a Neurologist. *Id.* Mr. Miranda's mother recounts that her son was involved in a motorcycle accident in 2016 where he suffered a serious head injury. He spent a week in the hospital as a result. It was a hit and run accident where a person driving in a car struck Mr. Miranda while riding his motorcycle causing his head to hit the pavement. Mrs. Miranda states that his seizures began 6 to 7 months after that accident.

During the first of these attacks, she recalls that Mr. Miranda was shaking uncontrollably in his bed with his eyes rolling backwards. He had spittle coming out of his mouth and could not talk. He was also extremely disoriented and had to be subdued physically by emergency medical responders when taken to the hospital. Although Mr. Miranda is currently taking his anti-seizure

medication at Wyatt, he was not consistently taking it when not in custody. *See* PSR ¶ 59 (reference to medical records and "med noncompliance"). This translated into an increase in the frequency of these convulsive episodes. This was due in large part to sporadic access to health insurance. In addition to an uptick in seizure episodes, poorly treated epilepsy can lead to erratic behavior, mood swings, and psychological symptoms such as bouts of irrational fear and anxiety.

### B. The consequences of growing up in Dorchester

When the Court reviews Mr. Miranda's criminal history, it will see that a particular geographic location is mentioned repeatedly, "Olney Street", in Dorchester, MA. *See* PSR ¶¶ 31, 32. The traffic stop in this case that led to the discovery of a gun and ammunition in Mr. Miranda's possession took place at the intersection of Olney Street and Geneva Avenue in Dorchester. *See* PSR ¶ 8. Lastly, the United States Probation Department has indicated in the PSR that the Boston Regional Intelligence Center ("BRIC") has identified Mr. Miranda as an Olney Street "gang associate".[2] *See* PSR ¶ 63.

Mr. Miranda denies being a member of any gang but what he cannot deny is that fact that his lifetime address at 43 Norton Street in Dorchester, MA is literally around the corner from Olney Street and Geneva Avenue. This section of Dorchester has been identified as a "high

---

2 The American Civil Liberties Union of Massachusetts sued the Boston Police in 2018 to gain access to this "BRIC" database. The Boston Regional Intelligence Center is a unit of the Boston Police that gathers and analyzes intelligence which is accessible to federal law enforcement. The lawsuit was prompted by, among other things, the concerns of Civil Liberties advocates about the accuracy of the database and the impact it could have on individuals wrongly identified as gang members.

According to the rules and procedures outlined by the Boston Police, an individual is considered "active" if they have reached the criteria to be a gang associate, had contact with another gang member, or participated in some form of gang activity within the last five years to include instances where the individual may have been incarcerated. *See* https://www.documentcloud.org/documents/6219626-BPD-Rule-335-Gang-Assessment-Database.html.

crime area" by the Boston Police Department thus the plain clothes Youth Violence Strike Force patrol that stopped Mr. Miranda and his friend on the night of his arrest.



Although this area has always been his "neighborhood" and he has made friendships with people who live there, that does not make him a "gang associate". Having said that, he knows first hand that the area can be dangerous. In 2009 when he was walking in the area of a Walgreen's Pharmacy on Geneva Avenue with his younger cousin, they were set upon by a group of young men. One of the men was armed and shot at Mr. Miranda and his cousin. Mr. Miranda was hit in the left thigh and was later treated at Boston Medical Center for his injury. *See* PSR ¶ 60. No one was prosecuted for the assault. To this day, Mr. Miranda feels "pinching"

sensations in the area of the injury. Since that attack, Mr. Miranda has lived in fear of losing his life.

Living in this area of Dorchester has therefore negatively impacted Mr. Miranda's life in a multitude of ways. Although he certainly had control over his own actions while there over the years, he did not have any control over his family's financial circumstances and their decision to settle in this area of Boston to try to make a life for themselves. The Norton and Olney Street neighborhood has exposed Mr. Miranda to individuals and circumstances that have not only threatened his life but have facilitated the creation of a portion of his criminal history. Being there has also caused him to be falsely labeled as a "gang associate" and has led, in part, to his prosecution in this federal case.

### C. Mr. Miranda's relationship with Vanessa Andrade has created an overstated criminal history

Aside from the entries in his criminal history associated with Olney Street, the bulk of Mr. Miranda's criminal record exists because of his relationship with Ms. Vanessa Andrade. *See* PSR ¶¶ 34-37. He and Ms. Andrade have two children together: Isaiah Miranda, age 10 and Adrian Miranda, age 6. Mr. Miranda wishes the Court to understand that the volatility that has existed with Ms. Andrade over the years is now over and was more a product of jealousy and infidelity than of any violence. *See* PSR ¶ 55. Ms. Andrade spoke to the United States Probation Department for purposes of preparation of the PSR and confirmed this to be true. She described Mr. Miranda as an "amazing person and excellent father." *See* PSR ¶ 56. She also stated that he maintains telephone contact with his children as he prefers not to have them come into a prison environment to see him. *Id.*

When she was asked about the existence of domestic violence in the relationship, she simply stated that their relationship had been "bumpy" but that they "make it work for them and

would make it work when he is released from custody." *Id.* The criminal history point total for the cases involving Ms. Andrade is 5. If these points were deducted from his criminal history score, he would be a CHC I and the resultant guidelines range at a total offense level 21 would be 37-46 months.

### D. Why carry a loaded gun in a car on January 15, 2019?

Several of the factors described above led to the situation that took place on the evening of Mr. Miranda's arrest. First, he was literally a few miles from his home address on Norton Street when he was stopped by the police in the area of Olney Street and Geneva Ave driving with friends. Living in this part of Dorchester has always been a source of problems for him. Second, Mr. Miranda was not attending to his epilepsy properly by taking daily medication. This increased his fear and anxiety, likely to an irrational level, about getting shot at again as he did in 2009. For better or worse, he felt he needed to protect himself in the event he was attacked again and obtained this gun assure it. Lastly, with all due respect to Mr. Miranda, he was a very immature 28 year old at the time of his arrest. This last year of jail time at Wyatt has caused him to reflect repeatedly on the sheer stupidity of driving around drinking and partying with friends with a loaded gun in his pocket. His thinking is clear now as he has been taking his epilepsy medication regularly and he recognizes that he didn't need to carry a gun to feel safe in his own neighborhood.

## IV. The Risks to Mr. Miranda from Continued Custody

As of May 8, 2020, the new strain of coronavirus, which causes COVID-19, has infected over 3,902,628 people, leading to at least 272,286 deaths worldwide.[3] On March 11, 2020, the

---

[3] Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus COVID-19 Global Cases Dashboard (Mar. 30, 2020), at
https://gisanddata.maps.arcgis.com/apps/opsdashboard/index.html#/bda7594740fd40299423467

World Health Organization officially classified COVID-19 as a pandemic.[4] On March 13, 2020, President Trump declared a national emergency to address the pandemic.[5] Governor Baker declared a state of emergency in Massachusetts on March 10, 2020, and he issued several emergency orders.[6] Those orders range from closing all elementary and secondary schools to prohibiting on-site consumption of food and beverages to restricting visitor access to nursing homes to prohibiting public gatherings of more than 25 people. *Id.* On March 23, 2020, Governor Baker ordered all non-essential businesses to close. *Id.* Following the lead of government officials, this Court has issued over a dozen General Orders relative to coronavirus, including continuing all jury trials that were scheduled to begin before April 27, 2020 (General Order 20-2) and continuing all criminal hearings and deadlines other than motions for release or detention for 60 days, absent a showing of a case-specific liberty or public safety interest. (General Order 20-4). Other measures include postponing grand juries, civil mediation sessions and naturalization ceremonies, and restricting courthouse visitors.

Virtually all of the precautionary measures enacted by courts and by local, state and federal governments are designed to keep people out of crowded places and to ensure "social distancing" to lower the spread of the virus because it is highly contagious. The CDC advises

---

b48e9ecf6. *See also* World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 62 (Mar. 21, 2020) https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200322-sitrep-62-covid-19.pdf?sfvrsn=f7764c46_2

[4] WHO Characterizes COVID-19 as a Pandemic, World Health Organization (March 11, 2020) at https://bit.ly/2W8dwpS.

[5] Remarks by President Trump, Vice President Pence, and Members of the Coronavirus Task Force in Press Conference (March 13, 2020). https://www.whitehouse.gov/briefings-statements/remarks-president-trump-vice-president-pence-members-coronavirus-task-force-press-conference-3/.

[6] https://www.mass.gov/info-details/covid-19-state-of-emergency.

that the virus passes through coughing and by contact with contaminated surfaces.[7] Data published in the New England Journal of Medicine found that the highly contagious "virus can remain viable and infectious in aerosols [i.e. in the air] for hours and on surfaces up to days."[8] Additional studies also suggest that COVID-19 is capable of at least some airborne transmission: a study in China suggests that the illness may be spread by air currents in enclosed spaces.[9]

To combat transmission, the CDC has issued guidance discouraging gatherings of more than 10 people in one place.[10] The CDC also urges social distancing, meaning every person should remain at a distance of at least six feet from every other person.[11] Proper hygiene, including frequent cleaning of all surfaces and frequent, thorough hand washing is also recommended. On April 3, 2020, the CDC issued new guidance recommending the general

---

[7] *See* "How It Spreads," Center for Disease Control and Prevention (last accessed 03/21/2020), https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[8] Neeltje van Doremalen, et. al, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, New England J. Med., (March 17, 2020), https://www.nejm.org/doi/full/10.1056/NEJMc2004973

[9] Kenneth Chang, *How Coronavirus Infected Some, but Not All, in a Restaurant*, New York Times (Apr. 20, 2020) https://www.nytimes.com/2020/04/20/health/airflow-coronavirus-restaurants.html. *See also* CDC, *COVID-19 Outbreak Associated with Air Condition in Restaurant, Guangzhou, China, 2020*, Emerging Infectious Diseases (Jul. 2020) available at https://wwwnc.cdc.gov/eid/article/26/7/20-0764_article#comment. Additional papers are being published on the possibility of airborne transmission. *See, e.g.*, Lidia Morawska & Junki Cao, *Airborne Transmission of SARS-CoV-2: The world should face the reality*, Environment International (Apr. 20, 2020) available at https://www.ncbi.nlm.nih.gov/pubmed/32294574.

[10] Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Center for Disease Control and Prevention, 3 (Mar. 12, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[11] *See* supra note 7; see also Lisa Maragakis, "Coronavirus, Social Distancing, and Self-Quarantine," John Hopkins Univ. (last accessed March 21, 2020) https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/coronavirus-social-distancing-and-self-quarantine.

public to wear "cloth face coverings in public settings where other social distancing measures are difficult to maintain (e.g., grocery stores and pharmacies) especially in areas of significant community-based transmission." The Massachusetts Department of Public Health issued a similar advisory.[12]

For a host of reasons, inmates and staff are at heightened risk of contracting COVID-19.[13] The recommended measures for mitigating the spread of COVID-19 are not readily available for incarcerated detainees, or for those who must interact with them. Congregate settings such as jails and prisons allow for rapid spread of infectious diseases that are transmitted person to person, especially those passed by droplets through coughing and sneezing. In prison, people are confined in close proximity to one another and to the staff. Staff, by necessity, interact with each other, and with inmates when they enter a jail. Prior to entering a jail for their shift, they have interacted with their family, or they (or a family member) have gone out of their house consistent with "shelter in place" orders and directives. When they report for their shift, they may be unwitting carriers of COVID-19, introducing the virus into the prison and staff population and workspaces. When prisoners must share sleeping areas, dining halls, bathrooms, showers and other common areas, the opportunities for transmission are greater. In addition,

---

[12] CDC, *Recommendations for Cloth Face Covers,* Apr. 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html. (Last accessed April 6, 2020). *See also* Massachusetts Department of Public Health, Advisory Regarding Face Coverings and Cloth Masks, (Apr. 10, 2020) available at https://www.mass.gov/news/advisory-regarding-face-coverings-and-cloth-masks.

[13] *See, e.g.* Joseph A. Brick, *Infection Control in Jails and Prisons*, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise"); *see also* Claudia Lauer & Colleen Long, *US Prisons, Jails on Alert for Spread of Coronavirus*, Associated Press (Mar. 7, 2020).

there are reduced opportunities to apply necessary hygiene measures, as jails and prisons are often under resourced and under equipped.[14] According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[15]

According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[16] Medical professionals behind bars are sounding the alarm as well: "[W]e cannot change the fundamental nature of jail. We cannot socially distance dozens of elderly men living in a dorm, sharing a bathroom. Think of a cruise ship recklessly boarding more passengers each day … Please let as many out as you possibly can."[17]

In the Bureau of Prisons ("BOP"), the rate of infection is proceeding at a shocking rate,

---

[14] *See, e.g.* Joseph A. Brick, Infection Control in Jails and Prisons, 45 Clinical Infectious Diseases 1047, 1047 (Oct. 2007), https://doi.org/10.1086/521910 (noting that in jails "[t]he probability of transmission of potentially pathogenic organisms is increased by crowding, delays in medical evaluation and treatment, rationed access to soap, water, and clean laundry, [and] insufficient infection-control expertise").

[15] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[16] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), at https://bit.ly/2W9V6oS.

[17] Craig McCarthy, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* N.Y. Post (Mar. 19, 2020). *See also* Jennifer Grannerman, *A Rikers Island Doctor Speaks Out to Save Her Elderly Patients from the Cornoavirus*, The New Yorker (Mar. 20, 2020).

far surpassing the national rate:[18]



As of May 7, 2020, the BOP has reported **44 federal inmate deaths**, and 2,646 federal inmates and 244 BOP staff members who have tested positive for COVID-19.[19] The BOP's reported numbers of positive tests are almost certainly lower than the actual number of inmates and staff members who have become infected. This is because the BOP has not instituted mass testing for the coronavirus, and testing kits remain difficult to obtain. For example, the federal penitentiary in Terre Haute, Indiana, which houses between 2,500 and 3,000 inmates, received only four tests as of late March.[20] At the federal prison in Oakdale, Louisiana, where at least seven inmates have died and dozens have tested positive, "correctional officers were told to stop testing people and just assume that anyone with symptoms had been infected[.]"[21]

       Steps are being taken in some jurisdictions to facilitate the release of elderly and sick

---

[18] Graph created by the Federal Defenders of New York, and available on their website as of April 30, 2020: https://federaldefendersny.org/

[19] Federal Bureau of Prisons, COVID-19 (last accessed Apr. 20, 2020), https://www.bop.gov/coronavirus/index.jsp (numbers include those who have recovered after testing positive).

[20] Mother Jones, "Want to Know How Fast Coronavirus Can Spread in Prison? Look at Arkansas" (Apr. 13, 2020), https://www.motherjones.com/coronavirus-updates/2020/04/cummins-unit-prison-arkansas-coronavirus-spread/.

[21] *Id.*

prisoners and to reduce jail populations by discouraging the admission of individuals arrested on non-violent misdemeanor charges.[22] This is happening in Massachusetts in state courts as well.[23] Voices in Congress have called on the Department of Justice to "do all they can to release as many people as possible who are currently behind bars and at risk of getting sick." *See* March 19, 2020 Letter from U.S. Reps. Jerrold Nadler & Karen Bass to Attorney General William P Barr ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives. Accordingly, we urge you to put in place measures to ensure that both the flow of prisoners into federal facilities is slowed significantly and that prisoners who can and should be released are released forthwith. We cannot wait any longer to take action.");[24] *see also* March 19, 2020 Letter from Senator Kathleen Harris to BOP Director Michael Carvajal (noting that "[e]merging research has demonstrated how dangerous coronavirus is for the elderly and those with underlying conditions and compromised immune systems" and urging BOP to "tak[e] reasonable steps to reduce the incarcerated population and guard against potential exposure to coronavirus").[25]

---

[22] *See, e.g.,* Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, Wall Street Journal (Mar. 22, 2020).

[23] *See Citing Risk of Coronavirus Spread, DA Rollins Seeks Release of Many Suspects From Custody*," WCVB Channel 5 (Mar. 20, 2020) available at https://www.wcvb.com/article/citing-risk-of-coronavirus-spread-da-rollins-seeks-release-of-many-suspects-from-custody/31781799#.

[24] Available at https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf.

[25] Available at https://www.harris.senate.gov/imo/media/doc/Harris%20Letter%20to%20Carvajal%20(3.19).pdf *See also* March 9, 2020 letter from fifteen United States Senators to BOP Director Carvajal, available at https://www.warren.senate.gov/imo/media/doc/2020-03-09%20Senator%20Warren%20Letter%20to%20BOP%20re%20Coronavirus.pdf.; *See also* Mark Hallum, *Three New York Congress members tell feds to spring non-violent offenders from jail*, AMNY (Mar. 22, 2020) available at

Federal Courts are following suit. *See, e.g,,* United *States v. Matthaei*, ECF No. 30, Case No. 1:19-cr-243-BLW (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement order because "we must take every necessary action to protect vulnerable populations and the community at large"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *United States v. Stephens*, 2020 WL 1295155 (S.D.N.Y. Mar. 19, 2020) (granting release based on the "unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic" which places inmates, in particular, at "heightened risk"); *See also United States v. Jose Perez*, Amended Order, No. 19-cr-00297-PAE (S.D.N.Y. Mar. 19, 2020) (ECF No. 62) (ordering defendant's temporary release from custody "based on the unique confluence of serious health issues and other risk factors facing this defendant, including but not limited to the defendant's serious progressive lung disease and other significant health issues, which place him at a substantially heightened risk of dangerous complications should be contract COVID-19 as compared to most other individuals."); *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (sua sponte releasing detainee from immigration detention "in light of the rapidly escalating public health crisis"). Attorney General Barr recently indicated that the Bureau of Prisons would consider ways to send home or protect those most vulnerable, to be mindful about the dangers of the virus spreading inside the closed conditions of a prison.[26]

---

https://www.amny.com/coronavirus/three-new-york-congress-members-tell-feds-to-spring-non-violent-offenders-from-jail/.

[26] Philip Ewing, *Barr: Federal Prisons Mustn't Become 'Petri Dishes' For Coronavirus*, NPR March 26, 2020, available at: https://www.npr.org/sections/coronavirus-live-

Regarding the Wyatt Detention Facility, where Mr. Miranda is currently held, the Chief Judge of the District of Rhode Island has ordered the Warden to provide twice weekly status reports, including the total number of inmates and staff who have been tested, and have tested positive.[27] As of April 27, 2020, Wyatt had an inmate population of 576 persons. The majority of that prisoner population are federal detainees, numbering approximately 487. These numbers obviously do not account for staff at Wyatt who work multiple shifts per week, rotating in and out of the facility according to their assigned work schedules. Of those 576 inmates at Wyatt, only seventy-one (71) – 12% – have been tested for coronavirus. As of May 7, 2020, thirteen inmates and four staff members have tested positive. Further, a review of the weekly status reports filed by Wyatt indicate that the facility is not rapidly increasing its testing of inmates.

The lack of universal testing at Wyatt, and the seemingly slow scale of increased testing in recent weeks, makes it difficult to assess the true risk and scope of the pandemic there. But that lack of universal testing, paired with the conditions of confinement and the inability to socially distance while incarcerated, make the facility a powder keg for disease transmission. *See* Exhibit C, Boston Globe Op Ed, Nancy Gertner. Generally, inmates at Wyatt are still sharing cells, living spaces and common areas, and eating meals together. While the facility has provided inmates with temporary masks, their use is not mandatory and, as such, does little to stop the spread or minimize the risk of transmission of coronavirus. To sound the alarm, more than 60 immigration detainees at the facility are participating in a hunger strike "calling for their release amid concerns about the potential rapid spread of the novel coronavirus through the inmate

---

updates/2020/03/26/822016191/barr-federal-prisons-mustnt-become-petri-dishes-for-coronavirus

[27] See *In Re: Donald W. Wyatt Detention Center*, 1:20−mc−00004−JJM, Dkt 1; also available at: https://www.rid.uscourts.gov/sites/rid/files/Wyatt_General_Order.pdf

population."[28]

Although epilepsy is not listed by the Centers for Disease Control as a comorbidity that increases the risks of severe physical complications should infection occur, many medical resources recognize that persons with chronic neurological conditions are vulnerable. https://www.epilepsysociety.org.uk/epilepsy-and-coronavirus-covid-19-faqs#.XrWo_7NYaVQ. Over time, it is being discovered that the virus is affecting human beings in a multitude of different ways that were not previously anticipated. These concerns make continued custody of Mr. Miranda, whether at Wyatt or in a BOP setting, a grave risk to his health.

## CONCLUSION

Mr. Miranda deeply regrets his reckless actions in this case. As described by his parents, he is a good person at heart with artistic talents who simply wants a second chance to correct the path of his young life. *See* Exhibit B. His criminal history is somewhat overstated in that it is primarily relates to old, non-violent, relationship problems with Vanessa Andrade who now speaks highly of Mr. Miranda to the U.S. Probation Department and wishes to continue in a relationship with him to care for their children.

Mr. Miranda is close to his family as described in the attached letters from Maria and Cipriano Miranda. *Id.* When he is eventually released, he need not return to Dorchester as the family has relocated to Taunton. Living in that area has ruined and almost taken his life. Lastly, once released Mr. Miranda will continue to take his epilepsy medication which should minimize any chance of erratic behavior, mood swings, and irrational bouts of anxiety. All of these factors led to the offense conduct in this case. He has already served almost 13 months in custody in a

---

[28] Providence Journal, "More Than 60 ICE Detainees on 'Hunger Strike' Call for Release from Wyatt," April 7, 2020, available at: https://www.providencejournal.com/news/20200407/more-than-60-ice-detainees-on-rsquohunger-strikersquo-call-for-release-from-wyatt

prison setting that puts him at great risk of becoming seriously ill due to the COVID-19 pandemic. It is for these reasons that the defendant urges this Court to impose a sentence of time served followed by 3 years of supervised release with a special condition that the first 6 months of that period be served in home confinement with electronic monitoring.

                          Respectfully submitted,

                          JOVANI MIRANDA
                          By his Attorney,

                          /s/ Oscar Cruz, Jr.
                          Oscar Cruz, Jr.
                          B.B.O. #630813
                          Federal Defender Office
                          51 Sleeper Street, 5th Floor
                          Boston, MA  02210
                          Tel: 617-223-8061

## **CERTIFICATE OF SERVICE**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on May 8, 2020.

                          */s/ Oscar Cruz, Jr.*
                          Oscar Cruz, Jr.